**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **GRETCHEN WRIGHT**, *individually and on behalf of all others similarly situated*, | **Case No.** 2:23-cv-05566-DCN |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| **META PLATFORMS, INC.**, | **JURY TRIAL DEMANDED** |
| Defendant. | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Gretchen Wright, individually and on behalf of all similarly situated persons, alleges the following against Defendant Meta Platforms, Inc. ("Defendant") based on personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by counsel and review of public documents, as to all other matters:

**I.    INTRODUCTION**

1.    Plaintiff brings this class action against Defendant[1] for its obtaining her personal identifying information from the South Carolina Department of Motor Vehicles ("SCDMV") website without her consent—information expressly protected under the federal Drivers' Privacy Protection Act, 18 U.S.C. §§ 2721 *et seq.* ("DPPA") when connected with a motor vehicle record, including, *inter alia*, names, addresses, and disability information, the latter of which is defined under the DPPA as "highly restricted personal information." 18 U.S.C. § 2725(3), (4).

2.    When users visit facebook.com, Meta surreptitiously installs a tracking code

_____

[1] Meta Platforms, Inc. is the owner of the social media network Facebook.

called the Meta Pixel ("Pixel"), onto their web browsers. This tracking code, operating in the background, stays on Facebook users' browsers for up to 90 days and allows Defendant to collect information about what those users do when they are browsing other websites separate from the Facebook platform.[2] This includes tracking the actions Facebook users take while using the SCDMV website, https://scdmvonline.com/.

3.      The SCDMV website can be used to carry out a full range of vehicle-related transactions, from renewing a South Carolina driver's license or vehicle registration, changing an address, obtaining other types of identification, and getting a disabled placard.

4.      The SCDMV hosts the Pixel, which sends South Carolinians' personal information to Defendant without their consent, which information Defendant then uses to deliver them targeted advertisements. The defendant profits by selling this information to third parties that use these advertisements.

5.      Ther type of conduct is not new with the Internet age. The DPPA was enacted in 1994 out of "concern related to the States' common practice of selling personal information to businesses engaged in direct marketing and solicitation." *Maracich v. Spears*, 570 U.S. 48, 57 (2013). "The DPA regulates the universe of entities that participate as suppliers to the market for motor vehicle information—the States as initial suppliers of the information in interstate commerce and private resellers or redisclosers of that information in commerce." *Reno v. Condon*, 528 U.S. 141, 151 (2000).

6.      As such, the DPPA specifically bars companies like Meta from "knowingly obtain[ing] . . . or us[ing] personal information, from a motor vehicle record for a purpose not

---

[2] Alex Hern, *Meta injecting code into websites to track its users, research says*, THE GUARDIAN (Aug. 11, 2022), https://www.theguardian.com/technology/2022/aug/11/meta-injecting-code-into-websites-visited-by-its-users-to-track-them-research-says.

permitted" by the law. 18 U.S.C. § 2724(a). Obtaining and using drivers' personal information for direct marketing is not permitted by law. *See* 18 U.S.C. § 2721.

## II.   PARTIES

7.     Plaintiff Gretchen Wright is, and at all times mentioned herein was, an individual adult citizen and resident of North Charleston, South Carolina.

8.     Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business located at 1 Meta Way, Menlo Park, California 94025.

## III.   JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, *i.e.*, the DPPA.

10.     Ther Court has jurisdiction over Defendant because Defendant operates in South Carolina through the SCDMV website and conducts substantial business in South Carolina including (1) the mass surveillance and collection of Private Information from South Carolina citizens while they interact with the SCDMV website, and (2) using insights derived from that mass surveillance to then deliver targeted advertisements to those same South Carolina citizens.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District, and Defendant has harmed Class members residing in this District.

## IV.   FACTUAL ALLEGATIONS

### A.     *The DPPA*

12.     The DPPA was enacted in 1994 out of a concern related to the misuse of information that had been acquired through the States' coercive power, specifically the States' common practice of selling consumer data to businesses engaged in marketing and solicitation.

The DPPA regulates not only state motor vehicle departments, but also individuals and businesses that obtain and use personal information from those departments. The DPPA provides that, unless one of its exceptions applies, a state department of motor vehicles "shall not knowingly disclose or otherwise make available" "personal information" or "highly restricted personal information" from a "motor vehicle record." 18 U.S.C. §§ 2721(a)(1)-(2).

13.    Personal information from a motor vehicle record can only be disclosed for "bulk distribution for surveys, marketing or solicitation if the State has obtained the express consent of the person to whom such personal information pertains." *Id.* § 2721(b)(12).

14.    A "motor vehicle record" is any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." *Id.* § 2725(1). "[P]ersonal information" is any "information that identifies an individual" and includes correlated numbers, "including . . . [a] [S]ocial [S]ecuirty number, driver identification number, . . . [or] telephone number." *Id.* § 2725(3). An individual's "medical or disability information" is expressly listed as "personal information" and "highly restricted personal information." *Id.* § 2725(3), (4).

15.    The DPPA defines "express consent" narrowly as "consent in writing, including consent conveyed electronically that bears an electronic signature." *Id.* § 2725(5).

**B.    *The Meta Pixel***

16.    Facebook is the largest social networking platform in the world, with more than 3 billion monthly active users.[3] In order to "create a safe environment where people can trust and hold one another accountable," it "require[s] [users] to create Facebook account using the name

---

[3] Amanda Silberling, *Facebook surpasses 3 billion monthly active users*, TECHCRUNCH (July 26, 2023) https://techcrunch.com/2023/07/26/facebook-3-billion-users/.

they go by in everyday life."[4] As such, when creating an account, users must provide their first and last name, along with their birthdate and gender.[5]

17.    Defendant's main source of revenue is from selling advertising space on Facebook and other social media platforms it owns, like Instagram.[6] In selling advertising space, Defendant highlights its ability to target users.[7] It does this because it surveils user activity both on and off its platform, through the Meta Pixel, which other websites install and incorporate onto their websites.[8] This surveillance allows Defendant to track information about its users beyond what they expressly disclose, including their "interests" and "behaviors."[9]

18.    Defendant's own documentation describing the Pixel as code that Defendant's business customers can put on their website to "[m]ake sure your ads are shown to the right people. Find . . . people who have visited a specific page or taken a desired action on your website."[10]

> Once you've set up the Meta Pixel, the pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase. The pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Facebook ads.[11]

19.    Services Defendant provides using the data obtained through the Pixel include:

---

[4]    *Facebook Community Standards: Account Integrity and Authentic Identity*, META, https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/ (last visited Oct. 17, 2023).

[5] *Facebook Sign Up*, META, https://www.facebook.com/.

[6] Katie Paul & Yuvraj Malik, *Facebook parent Meta sees advertising jump, tops Wall Street targets*, Reuters (July 27, 2023), https://www.reuters.com/technology/facebook-parent-meta-forecasts-quarterly-revenue-above-estimates-2023-07-26/

[7]    *Why advertise on Facebook, Instagram and other Meta Technologies*, META, https://www.facebook.com/business/help/205029060038706 (last visited Oct. 17, 2023).

[8]    *About Meta Pixel*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Oct. 17, 2023).

[9] *Audience ad targeting*, META BUSINESS HELP CENTER, https://www.facebook.com/business/ads/ad-targeting (last visited Oct. 17, 2023).

[10] *Supra* n.8.

[11] *Id*.

a.    "Core Audiences," which allows advertisers to select highly specific filters and parameters, such as behavior and interests, Meta will use in directing their targeted advertisements;[12] and

b.    "Lookalike Audiences," which relies on information Meta obtains about end users to "identify people who share similar traits as your visitors":[13]

> So if your "Big spenders" segment is full of 25-35 year old females who live in urban areas, Facebook can create a Lookalike Audience of other 25-35 year old females who live in urban areas and who Facebook thinks might be interested in your products.[14]

20.    Advertisers control what actions—or as Defendant calls them, "events"—the Pixel will collect, such as the website's metadata, what pages a visitor views, and the content a user enters into a search box or other text box.[15] Defendant offers a menu of "standard events," or an advertiser can create their own "custom event" with their own tracking parameters.[16]

21.    Advertisers select how the Pixel will identify visitors to their website or specific pages within that website. The Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[17] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[18] Pixel-specific Data includes "the Pixel ID and cookie."[19] The Pixel is on on-going piece of code that collects and analyzes this

---

[12] *Supra* n.9.

[13]    David Vranicar, *A Complete Guide to Facebook Tracking for Beginners*, OBERLO, https://www.oberlo.com/blog/facebook-pixel (last visited Oct. 17, 2023).

[14] *Id*.

[15] *Meta Pixel Guides: Advanced*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/advanced (last visited Oct. 17, 2023).

[16]    *Specifications for Meta Pixel standard events*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Oct. 17, 2023).

[17] *Meta Pixel*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel (last visited Oct. 17, 2023).

[18] *Id*.

[19] *Id*.

data in the background without the user knowing and requires only the initial installation by the Defendant to remain active.

    **C.**    *The SCDMV Website*

    22.    The SCDMV website hosts the Pixel. For one thing, almost every page of the SCDMV website transmits a "PageView" event to Defendant, as shown below in Figure 1.



    23.    The "PageView" event tells Defendant which specific website URL the user has navigated to. As shown below in Figure 2, a huge amount of personal information can be conveyed about an individual from the "PageView" event alone, including whether he or she has a suspended license, needs to pay a reinstatement fee, needs to get a disabled placard, is seeking to renew a driver's or commercial vehicle license, and various other actions.



24.     For example, through the Pixel, Defendant is immediately privy to a user's seeking to change their name or address with the SCDMV. *See* Figure 3 (below). Defendant receives a GET request about this information in real time and adds it to the long list of data points about an individual user that it can use for targeted advertising, and to keep tabs on a user's personal identifying information.



25.    Moreover, many of the buttons within the webpages on the SCDMV website a additional Pixel event associated with the user's click of that button: "SubscribedButtonClick." Through that event, each time a user clicks a button, like the one shown below (Figure 4), Defendant is sent a GET request documenting that click.



26.    Thus, through the Pixel, Defendant obtains the "highly restricted personal information" of whether a driver seeks to "RENEW A PARKING PLACARD." The specifics of this are shown below (Figure 5) using publicly accessible website developer tools (with the user's c_user number redacted).



27.     For many SCDMV website users, their unique Facebook identification number

("c_user" number) was automatically transmitted to Defendant via the Pixel. This almost always happens when the user has a Facebook account they have accessed from the same device used to access the SCDMV website, *unless* the user specifically logged out of Facebook. Additionally, most app users opt for the "Keep Me Logged In" Facebook, in which case the Pixel invisibly transmits their c_user number to Defendant.

28.     In turn, Defendant uses the c_user number to link the user's private information to their unique identity and Facebook account, and it admits to having received this information. For example, the screenshot below was taken from a user's personal Facebook account, and more specifically their off-site activity report, shortly after using the SC DMV website.



29.     A user's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Defendant—or any ordinary person—can

easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

30.    The Pixel transmits additional cookies to Meta, as shown below (Figure 6).



| | | | |
|---|---|---|---|
| fr | 0vjUWbesdK9v5j0wo.AWVsxl... | .facebook.com | / | 2023-12-25T23:41:25.035Z |
| wd | 1865x966 | .facebook.com | / | 2023-10-02T15:06:46.000Z |
| c_user | 1505700116 | .facebook.com | / | 2024-09-25T23:41:25.034Z |
| datr | MpMvYdsZU8zEGGmK6YMdL... | .facebook.com | / | 2023-11-22T14:48:11.400Z |
| presence | C%7B%22lm3%22%3A%22u... | .facebook.com | / | Session |
| sb | ZTEtYZZxSmecdPr7BegRtryb | .facebook.com | / | 2024-10-29T15:06:45.415Z |

31.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[20] At a minimum, Defendant uses the fr cookie to identify particular users.[21]

---

[20] Ireland Data Protection Comm'r, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf
[21] *Cookies Policy*, META, https://www.facebook.com/policy/cookies/ (last visited Oct. 17, 2023).

32. Even without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Defendant uses this for targeted advertising.

33. Defendant uses the fr and c_user cookies to link Facebook IDs and corresponding Facebook profiles and the target ads specific to the Facebook ID's browsing and search histories across whichever third party sites have an active Facebook Pixel.

34. Given a Facebook user's "c_user number," it is shockingly easy to see which Facebook profile (and name) is associated with it. Anyone can "go to www.facebook.com/[id-number], replacing 'id-number' with the person's Facebook ID. With access to the profile, anyone can see the profile page including the person's name they used when registering with Facebook."[22]

35. Thus, the Facebook ID number is a correlated number—like a Social Security number, driver's license number, or telephone number—which can be used by anyone to identify an individual.

36. The Pixel uses both first- and third-party cookies. A first-party cookies is "created by the website the user is visiting"—*i.e.*, the SCDMV website.[23] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[24]

37. Defendant introduced first-party cookies in 2018 and made first-party cookies the Pixel's default setting, to allow the Pixel to get around improvements in how web browsers block third-party cookies. Before that, third-party cookies were the primary means by which Defendant

---

[22] *How to Find a Person from Their Facebook ID*, TECHWALLA, https://www.techwalla.com/articles/how-to-find-a-person-from-their-facebook-id (last visited Oct. 17, 2023).
[23] *First-Party Cookies*, PC MAG ENCYCLOPEDIA, https://www.pcmag.com/encyclopedia/term/first-party-cookie.
[24] *Third-Party Cookies*, PC MAG ENCYCLOPEDIA, https://www.pcmag.com/encyclopedia/term/third-party-cookie.

tracked people across the Web. The switch to a first-party cookie causes users' browsers to treat the Pixel as if it is offered by the website they are visiting rather than by Defendant, a third party. this evades the third-party cookie blocking functions of the modern web browser.[25]

  **D.**  ***Plaintiff's Experience***

  38.  Plaintiff Gretchen Wright used the SCDMV website to renew her vehicle registration and conduct other private business with the South Carolina Department of Motor Vehicles in or about September of 2023.

  39.  Plaintiff Wright had a Facebook account during that time and accessed the SCDMV website using the same device and browser that she used to access her Facebook account.

  40.  When Plaintiff Wright was navigating and using the SCDMV website, Meta obtained and used her personal information, along with various event data, including "PageView" and "SubscribedButtonClick." Alongside this event data, Defendant also obtained and used identifiers for Plaintiff Wright including the c_users and fr cookies to Meta, as cookies on her web browser.

  41.  Meta collected this information for its own benefit to further its advertising and marketing business.

  42.  Plaintiff Wright recalls seeing targeted ads related to her use of the website shortly after she used it, and the timing of these ads indicates that her information was indeed used by Defendant to further its own marketing.

  43.  Plaintiff Wright first discovered that Defendant surreptitiously collected and used her personal information in October of 2023.

---

[25] Sergiu Gatlan, *Facebook to Circumvent Cross-Site Tracking Block with New First-Party Cookie*, SOFTPEDIA NEWS (Oct. 6, 2018), https://news.softpedia.com/news/facebook-to-circumvent-cross-site-tracking-block-with-new-first-party-cookie-523089.shtml.

44.     Plaintiff Wright places a premium on her privacy, and she was injured by Defendant's misuse of her data because, among other things, the use was non-consensual in nature, exceeded the scope of any purported prior consent, and the use of her data in this manner contradicts Defendant's own representations and statements concerning the handling of sensitive information.

## V.    CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

46.     Specifically, Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have a Facebook account and visited https://scdmvonline.com/ after October 17, 2019.

47.     Excluded from the Class and Subclass are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as her judicial staff and immediate family members.

48.     Plaintiff reserves the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

49.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

50.     <u>Numerosity</u>. The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes that the proposed Class includes thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff but may be ascertained from Defendant's

records.

51.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

      a.    Whether Defendant collected Plaintiff's and Class members' Personal Information;

      b.    Whether Defendant unlawfully obtained and used Plaintiff's and Class members' Personal Information in violation of the DPPA;

      c.    Whether Defendant's actions were committed knowingly;

      d.    Whether Defendant disclosed Plaintiff's and Class members' Personal Information without consent;

      e.    Whether Plaintiff and Class members are entitled to actual and/or statutory damages; and

      f.    Whether Plaintiff and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

52.    <u>Typicality</u>. Plaintiff's claims are typical of those of the other Class members because, inter alia, all Class members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class members arise from the same operative facts and are based on the same legal theories.

53.    <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of Class members. Plaintiff's counsel is competent and experienced in

litigating class actions, including data privacy litigation of this kind.

54.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class members in that all of Plaintiff's and Class members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

55.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

56.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

57.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the identities of persons whose Private Information was exposed via the Pixel on

https://scdmvonline.com/.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Drivers Privacy Protection Act, 18 U.S.C. § 2721 *et seq.***
**(On Behalf of Plaintiff and the Class)**

58.     Plaintiff restates and realleges paragraphs 1 through 53 above as if fully set forth herein.

59.     Plaintiff brings this claim individually and on behalf of proposed Class members against Defendant.

60.     A Facebook ID number, (the c_user ID) is "personal information" under the DPPA because it "identifies an individual" in the same way that a Social Security number, driver identification number, or a telephone number identifies an individual. 18 U.S.C. § 2725(3).

61.     Webpages on the SCDMV website are a type of "motor vehicle record" under the DPPA, because they contain records that pertain to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification cards issued by the South Carolina DMV. *Id.* § 2725(1).

62.     Facebook users like Plaintiff and Class members had both encrypted and unencrypted Facebook ID numbers (fr and c_user cookies, respectively) placed on their web browsers by Defendant. When Plaintiff and Class members loaded a SCDMV webpage, the fr and c_user cookies were contained in the code of that webpage that was loaded onto Plaintiff's and Class members' web browsers. Those cookies then caused Plaintiff's and Class members' Facebook ID numbers to be transmitted to Defendant, and Defendant to obtain personal information from a motor vehicle record.

63.     Information about drivers applying for disability parking passes is "medical or

18

disability information," defined as "highly restricted personal information" under the DPPA. 18 U.S.C. § 2725(4).

64.    Defendant knew it would obtain this information from the SCDMV website because it allowed the SCDMV website, which stores motor vehicle records, to host the Meta Pixel.

65.    Defendant knowingly used the personal information it obtained from the SCDMV website to deliver targeted advertisements to Plaintiff and Class members.

66.    Neither Defendant nor the SCDMV obtained express consent from Plaintiff or Class members to obtain or use their personal information for this purpose.

67.    On behalf of herself and the Class, Plaintiff seeks: (1) injunctive and equitable relief as necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with the DPPA; (2) actual damages, but not less than liquidated damages of $2,500 for each violation of the DPPA pursuant to 18 U.S.C. § 2724(b)(1); and (3) reasonable attorneys' fees and costs and other litigation expenses. *Id.* § 2724.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and Class members, requests judgment against Defendant and that the Court grant the following:

    A.    For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

    B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class members' PII;

C.   For an award of actual damages and statutory damages, in an amount to be determined, as allowable by law;

D.   For an award of punitive damages, as allowable by law;

E.   For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

F.   Pre- and post-judgment interest on any amounts awarded; and

G.   Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  November 2, 2023

Respectfully submitted,

By: */s/ Harper Todd Segui*
Harper Todd Segui (Fed. ID 10841)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN LLC**
825 Low Country Blvd, Suite 101
Mount Pleasant, South Carolina
29464 Telephone 919.600.5000
 hsegui@milberg.com

Jeff Ostrow*
Steven Sukert*
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
sukert@kolawyers.com

Gary Klinger*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN LLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878

gklinger@milberg.com

*Counsel for Plaintiff and the Proposed Class*

*\*Pro Hac Vice* application forthcoming